Slip Op. 14-7

UNITED STATES COURT OF INTERNATIONAL TRADE

UNITED STATES OF AMERICA,

                          Plaintiff,

v.

AMERICAN HOME ASSURANCE CO.,

                          Defendant.

Before: Richard W. Goldberg, Senior Judge
Court No. 10-00185

## OPINION

[Plaintiff's motion for summary judgment is granted in part, denied in part.  Defendant's cross-motion for summary judgment is granted in part, denied in part.]

Dated:  January 23, 2014

*Edward F. Kenny*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for plaintiff.  With him on the brief were *Stuart F. Delery*, Principal Acting Assistant Attorney General, and *Barbara S. Williams*, Attorney in Charge of International Trade Field Office.  Of counsel on the brief was *Beth C. Brotman*, Attorney, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of Washington, DC.

*Herbert C. Shelley*, Steptoe & Johnson LLP, of Washington, DC, argued for defendant. On the brief were *Taylor Pillsbury*, Meeks, Sheppard, Leo & Pillsbury, of Newport Beach, CA, and *Ralph Sheppard*, Meeks, Sheppard, Leo & Pillsbury, of Fairfield, CT.

Goldberg, Senior Judge: This case is before the court on competing cross-motions for summary judgment.  In this action on a bond, Plaintiff, the United States ("United States" or "the Government"), seeks recovery of unpaid antidumping duties from surety Defendant American Home Assurance Company ("AHAC").  The parties dispute (1) whether AHAC is liable for the unpaid duties as the surety on a continuous bond, and (2) assuming AHAC is liable, whether AHAC owes the Government both prejudgment interest in the form of equitable interest and

interest pursuant to 19 U.S.C. § 580 (2006).  For reasons set forth below, the court finds that

AHAC is liable under the bond, but that the Government is only entitled to equitable

prejudgment interest.  Accordingly, summary judgment as to the United States is granted in part

and denied in part, and summary judgment as to AHAC is granted in part and denied in part.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

In 2001, AHAC entered into a continuous bond with importer JCOF (USA) International,

Inc. ("JCOF").  The Government now seeks recovery on the bond for unpaid antidumping duties.

Thus, jurisdiction is proper pursuant to 28 U.S.C. § 1582(2).

Both parties have moved for summary judgment.  Summary judgment is available when

"the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  USCIT R. 56(a).  To make the requisite showing, the

movant must cite "particular parts of materials in the record" and "show[] that the materials cited

do not establish the absence or presence of a genuine dispute."  USCIT R. 56(c).  A fact is

material if it could affect the outcome of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  A genuine dispute as to a material fact exists if, based on the evidence, a

reasonable factfinder could return a verdict for the nonmoving party.  *Id.*

## UNDISPUTED FACTS

Importers must generally post security before U.S. Customs and Border Protection

("Customs") will release imported merchandise from its custody.  *Hartford Fire Ins. Co. v.

United States*, 648 F.3d 1371, 1372 (Fed. Cir. 2011).  Importers often use surety companies to

post the required security.  *Id.*  A "surety bond creates a three-party relationship, in which the

surety becomes liable for the principal's debt or duty to the third party obligee."  *Ins. Co. of the

W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001).

AHAC is a surety company authorized to issue surety bonds.  Pl.'s Statement of Material Facts as to Which There Are No Genuine Issues to Be Tried, ECF No. 27 ("Pl.'s Facts") ¶ 1; Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There Are No Genuine Issues to Be Tried, ECF No. 30 ("Def.'s Resp.") ¶ 1.  AHAC issued the surety bond at issue in this case pursuant to an arrangement with U.S. importer JCOF.  Pl.'s Facts ¶ 2; Def.'s Resp. ¶ 2.  The bond, on which JCOF and AHAC were jointly and severally obligated, had a limit of liability of $600,000 per bond period.  Pl.'s Facts ¶ 3; Def.'s Resp. ¶ 3.[1]

During the period covered by the continuous bond, JCOF imported two entries of crawfish tail meat from Yangzhou Lakebest Foods Company, Ltd. ("Yangzhou Lakebest")—a Chinese exporter.  Pl.'s Mot. & Mem. in Supp. of Mot. for Summ. J., ECF No. 27 ("Pl.'s Br."), at Ex. D, Resp. 4.  The entries occurred on November 1, 2001 and November 2, 2001 and were identified as entry numbers M42-1164064-2 and M42-1164065-9, respectively.  Pl.'s Facts ¶¶ 4–5; Def.'s Resp. ¶¶ 4–5.  JCOF declared a zero percent *ad valorem* antidumping duty rate for both entries at importation.  Pl.'s Br. at Ex. D, Resp. 4.

On February 13, 2004, the U.S. Department of Commerce ("Commerce") published the final results of an administrative review of the order on crawfish tail meat from the People's Republic of China.  *Freshwater Crawfish Tail Meat from the People's Republic of China*, 69 Fed. Reg. 7193 (Dep't Commerce Feb. 13, 2004) ("*Final Results*").  In those results, Commerce assigned Yangzhou Lakebest an antidumping duty rate of 223.01% *ad valorem*.  *Id.* at 7197.  The review period spanned from September 1, 2001 to August 31, 2002.  *Id.* at 7194.

---

[1] This bond is called a continuous bond, and it "cover[s] liabilities resulting from multiple import transactions over a period of time, such as one year."  *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs & Border Prot.*, 30 CIT 1838, 1839, 465 F. Supp. 2d 1300, 1302 (2006).

On May 12, 2004, Commerce directed Customs to liquidate entries of the subject

crawfish meat at the rates set forth in its *Final Results*.[2]  Pl.'s Facts ¶ 9; Def.'s Resp. ¶ 9.

Because Commerce's review period included November 2001, JCOF's two entries were subject

to Yangzhou Lakebest's 223.01% *ad valorem* antidumping duty rate plus interest.  *See* Pl.'s

Facts ¶ 6; Def.'s Resp. ¶ 6.  On June 25, 2004, Customs liquidated the entries accordingly ("June

2004 liquidations").  *See* Pl.'s Facts ¶ 11; Def.'s Resp. ¶ 11.  When JCOF did not timely pay the

duties, Customs made a formal demand on AHAC.  Pl.'s Br. at Ex. G.  AHAC then filed Protest

Number 2704-04-102655.  Pl.'s Facts ¶ 12; Def.'s Facts ¶ 12.  Customs denied that protest on

July 8, 2005, and AHAC did not institute litigation challenging the protest denial.  *See* Pl.'s Facts

¶ 15; Def.'s Facts ¶ 15.

Much of the confusion in this case stems from litigation that an exporter other than

Yangzhou Lakebest instituted in response to the *Final Results*.  Due to the pendency of litigation,

the court preliminarily enjoined the Government from liquidating entries exported by Shanghai

Taoen International Trading Co., Ltd ("Shanghai Taoen") during the period of review.  Pl.'s

Facts ¶ 8; Def.'s Facts ¶ 8.  The preliminary injunction did not affect JCOF's imports, as the

imports came from Yangzhou Lakebest and Yangzhou Lakebest was not a party to the pending

litigation.  *See* Def.'s Statement of Add'l Material Facts as to Which There Are No Genuine

Issues to Be Tried, ECF No. 30 ("Def.'s Facts") ¶ 3; Pl.'s Resp. to Def.'s Statement of Add'l

Facts as to Which There Are No Genuine Issues to Be Tried, ECF No. 37 ("Pl.'s Resp.") ¶ 3.

Nonetheless, when the Shanghai Taoen litigation concluded, Customs reliquidated JCOF's two

entries on June 3, 2005 ("June 2005 reliquidations").  *See* Pl.'s Facts ¶ 14; Def.'s Resp. ¶ 14.

---

[2] "Liquidation means the final computation or ascertainment of duties on entries for consumption or drawback entries."  19 C.F.R. § 159.1 (2013).  In antidumping duty cases, liquidation is suspended "until such time as a party may request an administrative review, and during the pendency of any such review."  *Decca Hospitality Furnishings, LLC v. United States*, 30 CIT 357, 360, 427 F. Supp. 2d 1249, 1252 (2006).  Liquidation of the entries at issue here had been suspended pending issuance of the *Final Results*.  Def.'s Facts ¶¶ 1–2; Pl.'s Resp. ¶¶ 1–2.

The June 2005 reliquidations resulted in new bills with a total bill amount $51,997.31 greater than the bills associated with the June 2004 liquidations.  *See* Pl.'s Br. at Exs. G, H.[3]  After Customs made a second demand on AHAC, AHAC filed protest number 2704-05-102579.  *See* Pl.'s Facts ¶ 16; Def.'s Resp. ¶ 16.  Again, AHAC did not institute litigation when Customs denied the protest.

Customs sent AHAC a demand letter on February 9, 2007, seeking total payment of $1,157,898.22 for unpaid duties plus interest in connection with JCOF's two entries.  Pl.'s Facts ¶ 18; Def.'s Facts ¶ 18.  AHAC denied liability on grounds unrelated to those it raises in the instant action.  Pl.'s Facts ¶ 19; Def.'s Facts ¶ 19; Pl.'s Br. at Ex. K.  The Government then instituted this action on a bond on June 21, 2010.  Summons & Compl., ECF Nos. 1–2.  In its answer, AHAC asserts multiple affirmative defenses hinging on its belief that JCOF's two entries were deemed liquidated at the rate in effect at the time of entry—i.e., zero percent.  *See* Answer to Compl., ECF No. 8.  AHAC, thus, believes it is not liable under the surety bond.

<u>**DISCUSSION**</u>

The parties raise two issues in their summary judgment briefing.  First, AHAC argues that the bills underlying the Government's collection action "are legally void" and that AHAC is not obligated to pay under continuous bond number 270114235.  *See* Def.'s Cross-Mot. & Mem. in Supp. of Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 30 ("Def.'s Br."), at 5.  Second, the parties dispute whether the Government is entitled to equitable and statutory interest on any recovery.  *Id.* at 9.  As set forth below, the court finds that the Government is entitled to recovery on the bond and awards equitable interest, but not statutory interest.

---

[3] The parties apparently dispute the composition of the enlarged figure.  The Government avers that any increase in the amount of the bills is due exclusively to interest accruing between October 2004 and October 2005.  *See* Pl.'s Resp. ¶ 7.  AHAC asserts that the increased bill amount represents a combination of increased principal and interest.  *See* Def.'s Facts ¶ 7.  Any dispute on this issue is not material for purposes of this case.

## I.   AHAC is legally obligated to pay under continuous bond number 270114235

The first issue in this case turns on the parties' divergent interpretations of the legal effect of the June 2005 reliquidations.  AHAC essentially argues that the untimely June 2005 reliquidations superseded and canceled the timely June 2004 liquidations.  Def.'s Br. at 6–7 (citing *Mitsubishi Elecs. Am., Inc. v. United States*, 18 CIT 929, 931, 865 F. Supp. 877, 879 (1994)).  Because the reliquidations occurred more than ninety days after the June 2004 liquidations, AHAC further avers that the June 2005 voluntary reliquidations were invalid under 19 U.S.C. § 1501.  Def.'s Br. at 7.  As a result, AHAC believes there were no valid liquidations.

Without any valid liquidations, AHAC asserts that the entries were deemed liquidated by operation of law at the rate asserted by the importer of record.  *Id.* at 8 (citing 19 U.S.C. § 1504(d)).  19 U.S.C. § 1504(d) compels Commerce to liquidate previously suspended entries "within 6 months after receiving notice of the removal [of the suspension] from the Department of Commerce."  For purposes of this case, the six-month clock began running when Commerce published its *Final Results* on February 13, 2004.  Def.'s Br. at 8 (citing *Int'l Trading Co. v. United States*, 412 F.3d 1303, 1313 (Fed. Cir. 2005)).  The entries, thus, purportedly liquidated by operation of law at zero percent *ad valorem*—the rate JCOF asserted at the time of entry.  *Id.*

According to AHAC, it did not need to challenge the June 2005 reliquidations in this Court because they were void at their inception and not merely voidable.  Generally, "all liquidations, whether legal or not, are subject to [19 U.S.C. § 1514's] timely protest requirement" and become final and conclusive unless an authorized party files a protest or commences a civil action contesting the denial of a protest.  *Juice Farms, Inc. v. United States*, 68 F.3d 1344, 1346 (Fed. Cir. 1995).  However, relying on the Federal Circuit's holding in *United States v. Cherry Hill Textiles, Inc.*, 112 F.3d 1550, 1560 (Fed. Cir. 1997), AHAC argues that the June 2005

reliquidations were legally void because they occurred after a final, deemed liquidation.  Def.'s

Br. 9.  AHAC therefore asserts that it was not subject to the timely protest requirement.  *Id.*

AHAC's arguments are unpersuasive.  The court agrees that Customs' untimely

reliquidations vacated and "substituted for the collector's original liquidation."  *Mitsubishi*, 18

CIT at 931, 865 F. Supp. at 879.  Nonetheless, the court finds that the timely protest requirement

applied because the entries at issue were not deemed liquidated by operation of law and because

the reliquidations occurred before the June 2004 liquidations became final.  Thus, the June 2005

reliquidations—"whether legal or not"—became final and conclusive against AHAC when

AHAC did not institute litigation challenging them.  *See Juice Farms*, 68 F.3d at 1346; *accord*

*Philip Morris U.S.A. v. United States*, No. 89-1712, 1990 WL 79000, at *2 (Fed. Cir. June 13,

1990) ("[A]n unlawful reliquidation is not void, but is merely voidable.").

A review of relevant case law is instructive.  In *Juice Farms*, Customs erroneously

liquidated entries subject to a suspension order.  68 F.3d at 1345.  The importer did not recognize

the error until the administrative review concluded, at which point the importer attempted to

protest the liquidations.  *Id.*  Customs denied the protest as untimely, and the importer filed suit

in this Court.  *Id.*  In affirming the court's dismissal of the action for lack of jurisdiction, the

Federal Circuit found that even inadvertent, unlawful liquidations are subject to the timely

protest requirement.  *Id.* at 1346.

In *Cherry Hill*, the Federal Circuit concluded that the timely protest requirement applied

with equal force in government collection actions.  112 F.3d at 1557.  Nonetheless, based on the

facts of the case, the court identified an exception to this general rule.  *Id.* at 1558.  In *Cherry*

*Hill*, Customs delayed more than thirteen months before liquidating certain entries as dutiable

that had previously entered duty-free.  *Id.* at 1551.  In the intervening period between entry and

liquidation, though, a liquidation had already taken effect by operation of law under the deemed

liquidation statute.  *Id.* at 1559 (citing 19 U.S.C. § 1504(a)).

The surety in *Cherry Hill* did not protest the belated liquidation, but raised the deemed

liquidation issue in a subsequent government enforcement action.  *Id.* at 1558.  The Federal

Circuit found that the surety was not barred from launching this collateral attack.  *Id.*  Because a

previous, deemed liquidation had already become final, the court found that the new liquidation

"ha[d] no legal effect" and could not increase the surety's liability.  *Id.* at 1560.  In other words,

once a final and conclusive liquidation occurs (and the Government's cause of action expires),

"Customs cannot breathe new life into it merely by liquidating the entry anew."  *Id.*

Unlike in *Cherry Hill*, there were no final and conclusive liquidations in this case when

the June 2005 reliquidations occurred.  First, the June 2004 liquidations were not yet final under

19 U.S.C. § 1514 because AHAC's protest was still pending on June 3, 2005.  *See* 19 U.S.C.

§ 1514(a) (providing that liquidations become "final and conclusive upon all persons (including

the United States and any officer thereof) *unless* a protest is filed in accordance with this section"

(emphasis added)).  Second, despite AHAC's contrary assertions, the entries were not deemed

liquidated by operation of law under 19 U.S.C. § 1504(d).

On its face, 19 U.S.C. § 1504(d) applies when an entry is "not liquidated by [Customs]

within 6 months after receiving" notice of the removal of a suspension of liquidation.  *See also*

*Fujitsu Gen. Am., Inc. v. United States*, 283 F.3d 1364, 1376 (Fed. Cir. 2002).  Customs' June

2004 liquidations occurred within six months of the February 13, 2004 publication of the *Final*

*Results*, which constituted notice for the purpose of 19 U.S.C. § 1504(d) that the suspension of

liquidation had been removed.  *See Int'l Trading*, 412 F.3d at 1313.  Therefore, no deemed

liquidation occurred under 19 U.S.C. § 1504(d).

AHAC has not convinced the court that a contrary conclusion is warranted.  Indeed, adopting AHAC's interpretation would set untenable precedent.  Logically extended, AHAC's argument would mean that any reliquidation after six months could result in a retroactive deemed liquidation, as the reliquidation would supersede the original, timely liquidation.  AHAC's argument also fails if it hinges on the belief that the June 2005 reliquidations were invalid because they violated 19 U.S.C. § 1501.  Though the reliquidations occurred more than ninety days following notice of the original liquidation, such belated reliquidations are still subject to the timely protest requirement.  *See Philip Morris*, 1990 WL 79000, at *2; *Mitsubishi*, 18 CIT at 931, 865 F. Supp. at 879.  Further, AHAC cannot reasonably argue that the June 2005 reliquidations are simultaneously valid for purposes of creating deemed liquidations by replacing the original liquidations and void *ab initio* such that they need not be challenged under the procedures for protesting reliquidations and contesting protest denials in this Court.

AHAC's interpretation also does little to advance the purposes of the deemed liquidation statute.  19 U.S.C. § 1504 was designed to "'eliminate unanticipated requests for additional duties coming years after the original entry.'"  *Cherry Hill*, 112 F.3d at 1559 (quoting *Customs Procedural Reform Act of 1977: Hearings on H.R. 8149 and H.R. 8222 Before the Subcomm. on Trade of the H. Comm. on Ways & Means*, 95th Cong. 56 (1977) (statement of Robert E. Chasen, Comm'r of Customs)); S. Rep. No. 95-778, at 31–32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211, 2243 ("Under the present law, an importer may learn years after goods have been imported and sold that additional duties are due . . . .").  An erroneous reliquidation occurring before a timely liquidation had even become final does not fall within the statute's intended reach.

In sum, the facts of *Cherry Hill* are distinguishable from those in the instant case; accordingly, a different result obtains.  AHAC bore the burden of timely challenging the

admittedly erroneous reliquidations before this court.  Because it did not, and because no

exception to the timely protest requirement applies, AHAC has not preserved its challenge and is

liable as a surety under the continuous bond.[4]  *See Juice Farms*, 68 F.3d at 1346.

## II.  The Government is entitled to equitable interest, but not 19 U.S.C. § 580 interest

The court must next determine the amount of money due to the Government.  The

importer's total liability for the two entries exceeds AHAC's $600,000 bond limit.  *See* Pl.'s

Facts ¶ 11; Def.'s Resp. ¶ 11.  Therefore, if AHAC owes anything over the bond limit, it will

come exclusively as damages in the form of interest for its own default.  The Government seeks

two types of interest in this case—statutory interest under 19 U.S.C. § 580 and equitable interest.

As explained below, the court rejects the Government's claim for § 580 interest, but awards

equitable interest.

### A.  Statutory interest under 19 U.S.C. § 580 is not available when the bond secures antidumping duties

19 U.S.C. § 580 provides that "[u]pon all bonds, on which suits are brought for the

recovery of *duties*, interest shall be allowed, at the rate of 6 per centum a year, from the time

when said bonds became due." (emphasis added).  The Government asserts that the statute's

plain language compels an award of interest in this case.  Pl.'s Br. 21–22; *see also United States*

*v. Fed. Ins. Co.*, 857 F.2d 1457, 1459 (Fed. Cir. 1988) (finding in a case involving ordinary

customs duties that, "[a]s a matter of law, whenever a court awards unpaid import duties in a suit

---

[4] The same logic applies to an alternative argument AHAC first raised at oral argument.  Specifically, AHAC asserted that Customs ignored Commerce's June 1, 2004 instructions when it liquidated the entries in question on June 25, 2004 and that Customs' action rendered the June 2004 liquidations void.  Transcript of Oral Argument 22–24, ECF No. 49.  AHAC's argument centers on instructions Commerce issued to Customs on June 1, 2004 in response to the *Shanghai Taoen* injunction.  Those instructions directed Customs not to liquidate entries of subject merchandise exported by Shanghai Taoen or imported by an importer other than JCOF, and further ordered Customs to "[c]ontinue to suspend liquidation of *other entries* until liquidation instructions are provided."  Pl.'s Br. at Ex. I (emphasis added).  Because AHAC concedes that the injunction itself did not cover JCOF's entries, *see* Def.'s Facts ¶ 3, it was incumbent on AHAC to pursue any concerns regarding the legality of the June 2004 liquidations through normal protest avenues.  By twice abandoning its protests, AHAC may not now attack the legitimacy of the June 2004 liquidations.  *See Juice Farms*, 68 F.3d at 1346.

upon a bond, interest must be attached pursuant to section 580").  In other words, because the

instant action is a suit for the recovery of antidumping "duties," the Government submits that

interest "shall be allowed."  *See* 19 U.S.C. § 580.

The historical context of 19 U.S.C. § 580 complicates the matter.  Congress enacted

§ 580 in 1799, and the statute applied at its inception to bonds securing payment of then-existing

customs duties.  Antidumping duties did not arise until 1921.  Antidumping Act of 1921, Pub. L.

No. 67-10, 42 Stat. 11.  Aside from codifying the statute and moving it from Title 28 of the U.S.

Code (pertaining to Judiciary and Judicial Procedure) to Title 19 of the U.S. Code (pertaining to

Customs Duties), Congress has not substantively updated § 580 or otherwise signaled whether

the statute applies to antidumping duties.[5]  Further, no court has ruled on whether § 580's

reference to "duties" contemplates antidumping duties.

Against this backdrop, both sides advance divergent interpretations of 19 U.S.C. § 580

and its application in this case.  According to the Government, several reasons support extending

the statute to bonds securing antidumping duties.  Initially, the Government notes that early

customs duties—like antidumping duties—were at least partially rooted in protectionist

principles.  Pl.'s Mem. in Supp. of Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J., ECF

No. 37 ("Pl.'s Resp. Br."), at 8.  Moreover, modern Congress has used the word duties to refer

collectively to customs duties and antidumping duties.  *See id.* at 9–11.  Thus, the Government

asserts that Congress has extended § 580's reach by retaining its unqualified language even as

new duties emerged.  *See* Pl.'s Br. 22.

---

[5] The precursor to 19 U.S.C. § 580 originally provided as follows: "[O]n all bonds upon which suits shall
be commenced, an interest shall be allowed at the rate of six per cent. per annum, from the time when said bonds
become due, until the payment thereof."  *See* Act of Mar. 2, 1799, ch 22, § 65, 1 Stat. 627, 677.  The language
changed to what it is now when the statute was first codified in the Revised Statutes.  *See* 1 Rev. Stat. 181, § 963
(1875).  Section 580 was then later reclassified in the U.S. Code as 28 U.S.C. § 787, before being moved to Title 19
in 1948.  *See* 28 U.S.C. § 787 (1946); 19 U.S.C. § 580 (1952).  However, these minor editorial changes neither
substantively altered the provision nor resulted from subsequent congressional action.  *See Chapman v. Houston
Welfare Rights Org.*, 441 U.S. 600, 625 (1979) (noting the Revised Statutes were not intended to alter existing law).

AHAC counters that revenue generation was the overriding purpose of early customs

duties and that antidumping duties are imposed for distinct, remedial reasons.  *See* Def.'s Reply

to Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J., ECF No.

42 ("Def.'s Resp. Br."), at 9.  AHAC asserts that the disparate purposes underlying duties

implementing trade remedies and customs duties preclude interpreting "duties" in § 580 to cover

antidumping duties.  Def.'s Br. 12.  AHAC also notes that courts have distinguished between

duties implementing trade remedies and customs duties, and in some instances have interpreted

the word "duties" to exclude antidumping duties.  *Id.* (citing *Dynacraft Indus. v. United States*,

24 CIT 987, 992, 118 F. Supp. 2d 1286, 1291 (2000); *Wheatland Tube Co. v. United States*, 495

F.3d 1355, 1361 (Fed. Cir. 2007)).  For these reasons, Congress' failure to clarify § 580's reach

supposedly forecloses its application in this context.

      i.     <u>Legal framework</u>

Supreme Court precedent teaches that the meaning of statutory language can expand over

time.  *See West v. Gibson*, 527 U.S. 212, 218 (1999) ("Words in statutes can enlarge or contract

their scope as other changes, in law or in the world, require their application to new instances

. . . .").  A "statute is presumed to speak from the time of its enactment" and to "embrace[] all

such . . . things as subsequently fall within its scope."  *De Lima v. Bidwell*, 182 U.S. 1, 197

(1901).  As a result, general, prospective statutes apply to later-created concepts so long as the

"language fairly and clearly includes them."  *Newman v. Arthur*, 109 U.S. 132, 138 (1883);

*accord Cain v. Bowlby*, 114 F.2d 519, 522 (10th Cir. 1940).  The court looks to the meaning and

intent of the original statute to determine whether that statute fairly and clearly includes a new

concept.  *See Jerome H. Remick & Co. v. Am. Auto. Accessories Co.*, 5 F.2d 411, 411 (6th Cir.

1925) (cited approvingly in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 158 (1975)).

For example, in *Cain*, a widow instituted litigation against a truck driver who fatally struck her husband on a highway. 114 F.2d at 521. The statute underlying the widow's action applied to the negligence of "driver[s] of any stage coach or other public conveyance." *Id.* The court addressed whether the words "other public conveyance" fairly included a truck driver operating as a common carrier even though trucks did not exist at the statute's enactment. *Id.* at 522. In its analysis, the court examined the historical purpose of stage coaches—to transport passengers and property—and concluded that truck drivers engaged as common carriers did not differ in any meaningful way. *Id.* at 523. Thus, the court extended the statute to cover truck drivers engaged as common carriers. *Id.*

Other courts have used reasoning similar to that found in *Cain*. For instance, in *Jerome H. Remick & Co.*, another court interpreted a Copyright Act provision to apply to radio broadcasts, even though radios did not exist at the Copyright Act's inception. 5 F.2d at 411–12. In *In re Fox Film Corp.*, 145 A. 514 (Pa. 1929), a Pennsylvania court interpreted a statute requiring pre-approval before publicly presenting "films" to include subsequently-created sound films. Specifically, the court found that sound films were not "so distinctly and intrinsically separate and apart from the" original meaning of the word film (i.e., silent films) as to be a "fundamentally . . . new creation." *Id.* at 516–17.

ii.   19 U.S.C. § 580 does not apply to later-created antidumping duties serving a fundamentally different purpose than historical customs duties

In light of that background, this court must decide whether "duties" in § 580 (and the meaning assigned to it in 1799) "fairly and clearly includes" modern remedial duties like antidumping duties. *See Newman*, 109 U.S. at 138. Because neither Customs nor any other agency has been charged with administering § 580, the court construes the statute without deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844

(1984) (requiring deference to an agency's reasonable "construction of a statutory scheme *it is entrusted to administer*" (emphasis added)).

In 1799, Congress used the word "duties" to describe the duty assessment scheme that it had established for imported merchandise, similar to the modern customs duty regime.  At first glance, it might appear reasonable to read § 580 to cover all subsequently-created import duties. But the court declines to reach that conclusion because in the period since the statute's enactment over 200 years ago, Congress, courts, and the Government itself have counseled that antidumping duties are not comparable to normal customs duties in function, purpose, and character.  *See, e.g.*, *Dynacraft*, 24 CIT at 992–93, 118 F. Supp. 2d at 1291–92 (cataloging disparate treatment); *Wheatland*, 495 F.3d at 1361–63 (same).

Initially, the court notes that different entities administer antidumping duty law and customs law.  Congress itself sets customs duty rates, while an administrative agency (Commerce) sets antidumping duty rates.  Although Customs implements the regime that Congress has established, it does not have discretion regarding the rates of duty or whether to collect customs duties at all.  Commerce, however, is authorized to investigate alleged dumping and set antidumping duty rates on its own.  *See, e.g.*, 19 U.S.C. §§ 1673, 1675.  The two duty regimes are also applied differently.  "Regular" customs duties are assessable on all imports of particular merchandise and are permanent unless modified by Congress.  *Wheatland*, 495 F.3d at 1362; *Int'l Forwarding Co. v. United States*, 6 Cust. Ct. 881, 882, R.D. 5197 (1941).  "Special" antidumping duties are levied against only certain imports, are subject to administrative review annually, and terminate after five years unless Commerce and the U.S. International Trade Commission respectively determine that revocation would lead to continuation or recurrence of

dumping and material injury.  *See* 19 U.S.C. § 1675(a), (d)(2); *Wheatland*, 495 F.3d at 1362;

*Int'l Forwarding*, 6 Cust. Ct. at 882.

Moreover, ordinary customs duties and antidumping duties serve fundamentally different

purposes.  The court accepts that the nation's first customs duties were rooted in some muted

protectionist principles.  *See* Act of July 4, 1789, ch. 2, § 1, 1 Stat. 24 (1789) (creating duties "for

the support of government, for the discharge of the debts of the United States, and the

encouragement and protection of manufactures").  Nonetheless, the critical purpose of early

duties was to generate revenue for the nascent country—a purpose that is still reflected in

modern customs duties.  *See, e.g.*, *United States v. Laurenti*, 581 F.2d 37, 41 n.12 (2d Cir. 1978)

(noting that customs duties were a principal source of early federal revenue).[6]  Antidumping

duties, in contrast, are not intended as revenue-generating devices.  *See Canadian Wheat Bd. v.*

*United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011).  Antidumping duties serve the distinct

purpose of remedying the effect of unfair trade practices resulting in actual or threatened injury

to domestic like-product producers.  *See id.*  Specifically, antidumping duties are "intended to

raise the United States market price for the subject merchandise and thereby increase sales and

profits of domestic producers."  *Wheatland*, 495 F.3d at 1364.

Due to the well-documented differences between antidumping and customs duties, the

court has previously interpreted the word "duties" in an interest statute to encompass only

ordinary customs duties.  *Dynacraft*, 24 CIT at 993, 118 F. Supp. 2d at 1292.  In *Dynacraft*, an

importer deposited estimated duties after an affirmative preliminary determination in an

---

[6] The Second Circuit has even opined that Congress enacted statutes like § 580 because customs duties were so critical to early revenue.  *See Laurenti*, 581 F.2d at 41 n.12.  In *Laurenti*, the Second Circuit catalogued instances where early Congress used the words "without delay" in connection with the collection of customs duties. *Id.*  The court ultimately concluded that Congress used that language because swift collection of duties was essential to government function.  *Id.*  Notably, the section of the Act of March 2, 1799 establishing § 580 provided that customs collectors should "*forthwith and without delay*, cause a prosecution to be commenced for the recovery" of unpaid duties.  Act of Mar. 2, 1799, ch 22, § 65, 1 Stat. 627, 676 (emphasis added).  This suggests that Congress may have passed § 580, at least in part, out of concern for the steady flow of revenue.

antidumping duty investigation.  *Id.* at 989–90, 118 F. Supp. 2d at 1288–89.  The International

Trade Commission ultimately reached a negative injury determination, and an antidumping duty

order never went into effect.  *Id.* at 989, 118 F. Supp. 2d at 1288.  The parties disputed whether

interest accrued on the importer's duty overpayment.  *Id.* at 990, 118 F. Supp. 2d at 1289.

On this point, two statutes conflicted.  19 U.S.C. § 1677g provided that overpayment

interest would not begin accruing until after publication of an antidumping or countervailing

duty order.  19 U.S.C. § 1505(c), by contrast, provided that interest would accrue from whenever

the importer was required to deposit "estimated *duties*, fees, and interest." (emphasis added).

The importer argued that it was entitled to § 1505(c) interest on the overpayment even though

§ 1677g interest was unavailable.  In effect, the importer asserted that "any antidumping duty is a

'duty' within the scope of" 19 U.S.C. § 1505(b) and (c).  *Dynacraft*, 24 CIT at 992, 118 F. Supp.

2d at 1291.

The court disagreed, equating the word "duties" in 19 U.S.C. § 1505(c) with customs

duties and finding no interest due to the importer.  *Id.* at 993, 118 F. Supp. 2d at 1292.  In partial

support of this finding, the court traced the disparate treatment of antidumping and customs

duties both pre- and post-Uruguay Rounds Agreement Act ("URAA").  For instance, before the

URAA, the Customs Court considered "regular" duties to be customs duties and "special" duties

to include antidumping duties.  *Id.* at 992, 118 F. Supp. 2d at 1291 (citing *Int'l Forwarding*, 6

Cust. Ct. at 882).  Congress maintained a similar distinction, referring to antidumping duties as

"special duties" and countervailing duties as "additional duties."  *Id.*, 118 F. Supp. 2d at 1291

(citing 19 U.S.C. § 1516(a) (Supp. V. 1975)); *see also* S. Rep. No. 67-16, at 1 (1921)

(establishing a "special dumping duty" to be imposed "in addition to the duties imposed . . . by

law").  The URAA statutory scheme continued to separate the two types of duties, placing

antidumping duties in a separate subtitle from other duties and referring to antidumping duties as

"additional duties."  24 CIT at 992–93, 118 F. Supp. 2d at 1292 (citing URAA, Pub. L. No. 103-

465, 108 Stat. 4809 (1994)).  Based on its examination, the *Dynacraft* court concluded that

"antidumping and countervailing duties were never intended to be regular or general duties."  *Id.*

at 992, 118 F. Supp. 2d at 1291.

In a different context, the Government itself has advocated an approach similar to that of

the *Dynacraft* court.  *See Wheatland*, 495 F.3d at 1361–63.  In *Wheatland*, the Federal Circuit

considered whether safeguard duties were "United States import duties" for purposes of 19

U.S.C.§ 1677a(c)(2)(A) calculations.  Because safeguard duties did not exist at

§ 1677a(c)(2)(A)'s original enactment, there was no congressional guidance on the disposition of

those particular duties.  *Id.* at 1362.  The Government averred that Congress did not intend for all

duties to be "United States import duties" and that "special" duties like antidumping duties

"should be distinguished from ordinary customs duties."  *Id.* at 1361.  The Government likened

safeguard duties to special antidumping duties in purpose and function and reasoned that those

duties were, thus, not "United States import duties" under § 1677a(c)(2)(A).  *Id.* at 1361–62.

The Federal Circuit upheld the Government's interpretation as "clearly reasonable."  *Id.* at 1366.

This court finds the reasoning in *Dynacraft* and *Wheatland* instructive in this case.  Here,

like in those cases, the court is asked to construe the open-ended word "duties" to include all

types of duties.  However, the *Dynacraft* and *Wheatland* cases counsel that the meaning of

"duties" is not necessarily so expansive and that it may be appropriate to distinguish between

duties.  Such a distinction is necessary here.  Antidumping duties were created over 120 years

after § 580's enactment, are meaningfully different from the customs duties existing in 1799, and

have long been treated as meaningfully different by Congress, courts, and the Government.[7]

For these reasons, the court cannot conclude that Congress in 1799 clearly would have intended

§ 580 to extend to all duties, no matter how distinct.  *See Newman*, 109 U.S. at 138.

Accordingly, § 580 interest is not available to the Government in this action.

### B.  The Government is entitled to equitable interest

Although the Government cannot receive interest under § 580, the Government is entitled

to equitable prejudgment interest.  Prejudgment interest is premised on the idea that it is

"inequitable and unfair for the government to make an interest-free loan . . . from the date of

final demand to the date of judgment."  *United States v. Imperial Food Imps.*, 834 F.2d 1013,

1016 (Fed. Cir. 1987); *see also West Virginia v. United States*, 479 U.S. 305, 310–11 n.2 (1987)

(affirming award "to compensate for the loss of use of money due as damages from the time the

claim accrues until judgment is entered").  Therefore, the "principle of full compensation"

underlies prejudgment interest awards.  *Princess Cruises, Inc. v. United States*, 397 F.3d 1358,

1368 (Fed. Cir. 2005); *accord City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995).

An award of equitable interest in this case raises two primary issues: (1) whether interest

may accrue against AHAC absent a showing of bad faith or dilatory conduct, and (2) whether the

court must balance relative equities before awarding interest.  For the following reasons, the

court finds that AHAC did not need to exhibit bad faith to be liable for equitable interest beyond

---

[7] Despite these well-established differences, the Government would have the court read § 580 to apply to antidumping duties by implication.  In other words, because Congress has sometimes used the word "duties" to refer to all types of duties, the Government asserts that § 580's language should similarly apply to all duties.  *See* Pl.'s Resp. Br. 9–11.  In the Government's view, Congress could have repealed § 580 or exempted duties from its coverage had it intended a different result, but it did not.  Pl.'s Br. 22.

The court disagrees.  Initially, the Government's argument is undercut by its own assertion in *Wheatland* that "duties" does not necessarily mean all duties.  Moreover, the Government's argument relies on congressional *inaction*—a particularly weak tool for ascertaining congressional intent.  *See Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003).  Lastly, the court is not asked to decide whether Congress has ever used the word "duties" to refer to all types of duties.  Rather, the court must decide whether to interpret § 580 beyond its initial reach absent persuasive indication that Congress clearly would have intended that result.

its bond limit.  The court also finds that equity favors awarding the Government prejudgment

interest from the due date of the second demand on AHAC.

> i.   <u>AHAC is liable for equitable prejudgment interest in excess of its bond limit</u>

Regarding the first issue, sureties are normally liable only for duties, fees, and interest up

to the bond limit.  *See United States v. Wash. Int'l Ins. Co.*, 25 CIT 1239, 1241–42, 177 F. Supp.

2d 1313, 1316 (2001).  However, sureties may be answerable for interest beyond that limit for

"their own default in *unjustly* withholding payment after being notified of the default of the

principal."  *United States v. U.S. Fid. & Guar. Co.*, 236 U.S. 512, 530–31 (1915) (emphasis

added); *accord Ins. Co. of N. Am. v. United States*, 951 F.2d 1244, 1246 (Fed Cir. 1991).

The parties disagree about when a surety's failure to pay becomes unjust.  AHAC argues

that equitable interest beyond the bond limit is available only when the surety exhibits bad faith

or dilatory conduct.  Def.'s Br. 13–14 (citing *Wash. Int'l*, 25 CIT at 1243, 177 F. Supp. 2d at

1318).  The Government maintains that misconduct is not a precondition to an award of equitable

interest here.  *See* Pl.'s Resp. Br. 15–17 (citing *United States v. Canex Int'l Lumber Sales Ltd.*,

Slip Op. 11-98, 2011 WL 3438870 (CIT Aug. 5, 2011); *United States v. Millenium Lumber

Distrib. Co.*, 37 CIT __, 887 F. Supp. 2d 1369 (2013)).

When addressing the accrual of prejudgment interest in excess of a surety's bond limit,

the Federal Circuit has held that "if a surety delays payment beyond proper notification of

liability, interest accrues on the debt."  *Ins. Co. of N. Am.*, 951 F.2d at 1246 (interpreting the

"unjustly withholding" language from *U.S. Fid. & Guar. Co.*).  As a result, the court finds that

AHAC need not have exhibited bad faith to be liable for interest beyond its bond limit.  Rather,

the dispositive fact here is that AHAC did not pay following the Government's proper demand

on the continuous bond, thereby depriving the Government of the ability to use the withheld

funds.  That failure exposes AHAC to potential interest liability in excess of its bond limit.

    ii.    <u>The court finds that an award of prejudgment interest is warranted here</u>

However, case law is less clear regarding whether prejudgment interest should be

awarded *automatically* after a surety's default or whether the court must first balance equities.

*See Princess Cruises, Inc.*, 397 F.3d at 1368 ("The degree to which the trial court is to balance

equitable factors to determine whether to award prejudgment interest is not easy to discern from

the case law.").  Earlier Supreme Court case law suggested that prejudgment interest turned on a

balancing of relative equities.  For instance, in *Blau v. Lehman*, 368 U.S. 403, 414 (1962), the

Supreme Court noted that "'interest is not recovered according to a rigid theory of compensation

for money withheld, but is given in response to considerations of fairness.'"  (quoting *Bd. of*

*Comm'rs of Jackson Cty. v. United States*, 308 U.S. 343, 352 (1939)).

However, in the years since *Blau*, the Supreme Court has moved towards a "general rule"

that prejudgment interest is available "subject to a limited exception for 'peculiar' or

'exceptional' circumstances."  *Nat'l Gypsum Co.*, 515 U.S. at 195 (noting, in a maritime case,

that full compensation is the "essential rationale" for awarding prejudgment interest).  Indeed, in

a case involving a contractual dispute between West Virginia and the Federal Government, the

Court explicitly rejected a balancing of the equities approach when awarding prejudgment

interest to the Government.  *West Virginia*, 479 U.S. at 311 n.3.  The Court did note, though, that

other equitable considerations like laches might bar a valid claim for interest.  *Id.*  In *Kansas v.*

*Colorado*, 533 U.S. 1, 13–14 (2001), the Court similarly suggested that prejudgment interest is

now "imposed as a matter of course" without balancing the equities.

Although case law diverges on what equitable factors the Court should consider in awarding prejudgment interest, it is clear that full compensation should be the court's overriding concern. It appears that not awarding equitable prejudgment interest would be aberrational and due to exceptional circumstances. In this case, AHAC believes that such exceptional circumstances exist because (1) the Government delayed in bringing suit, (2) AHAC raised good faith defenses to liability, and (3) Customs did not timely liquidate the subject entries. Def.'s Br. 15–17; Def.'s Resp. Br. 5–8. But those reasons do not demonstrate that equitable interest is inappropriate here.

While the Government's delay in bringing suit may justify limiting or declining to award interest, the Government did not excessively delay instituting the instant action. *See United States v. Reul*, 959 F.2d 1572, 1578–79 (Fed. Cir. 1992) (noting that the Government's "laxness" in bringing an action may factor into an equity analysis); *West Virginia*, 479 U.S. at 311 n.3 (citing doctrine of laches). Although the Government waited until close to the expiration of the statute of limitations, AHAC had no reason to believe that the Government had abandoned its claim, nor does it pinpoint any prejudice that it suffered as a result of the delay. AHAC does not argue, for instance, that it was unable to successfully defend itself in the Government's action.

The fact that AHAC raised good-faith defenses to liability also does not constitute "an extraordinary circumstance that can justify denying prejudgment interest." *See Nat'l Gypsum Co.*, 515 U.S. at 198. As the Supreme Court noted in a maritime case, "the existence of a legitimate difference of opinion on the issue of liability is merely a characteristic of most ordinary lawsuits." *Id.* at 198. Indeed, if the court were to award prejudgment interest only when confronted with bad faith claims, the prevailing party would rarely be fully compensated.

Finally, the court likewise disagrees that Customs' erroneous reliquidations bar equitable

interest, even though the court generally should "refrain from action which unnecessarily

countenances regulatory breaches."  *See United States v. Angelakos*, 12 CIT 515, 518, 688 F.

Supp. 636, 639 (1988).  The Government only seeks interest from the second Formal Demand on

the Surety, which AHAC received after the erroneous June 2005 reliquidations.  *See* Transcript

of Oral Argument 6, ECF No. 49.  This actually benefits AHAC because AHAC's bond limit

was already exhausted after the June 2004 reliquidations, and AHAC ultimately could have been

liable for prejudgment interest accruing after the first Formal Demand on the Surety pursuant to

the June 2004 liquidations.  Thus, the court finds that commencing interest after the second

Formal Demand on the Surety became due strikes a fair balance between the parties.

In sum, equity favors awarding the Government interest in this action.  The court, thus,

awards prejudgment interest at a rate set forth in 26 U.S.C. § 6621, commencing from the due

date of the second Formal Demand on the Surety.  The court also awards postjudgment interest

at a rate set forth in 28 U.S.C. § 1961 "based on the same considerations of equity and fairness."

*United States v. C.H. Robinson Co.*, 36 CIT __, __, 880 F. Supp. 2d 1335, 1348 (2012); *see also*

*United States v. Great Am. Ins. Co. of New York*, Nos. 2012-1462, 2012-1473, 2013 WL

6820678, at *3 (CAFC Dec. 27, 2013) (extending 28 U.S.C. § 1961 to this Court even though it

is expressly applicable to only district courts).

## <u>CONCLUSION</u>

For the foregoing reasons, the court grants in part and denies in part the Government's

motion for summary judgment.  The Government's motion is granted with respect to the issue of

AHAC's liability under continuous bond number 270114235.  Regarding the Government's

interest claims, the court grants the Government's claim for equitable pre- and post-judgment

interest, but denies the claim for statutory interest under 19 U.S.C. § 580.  Judgment will enter

accordingly.


                                                            /s/ Richard W. Goldberg
                                                             Richard W. Goldberg
                                                            Senior Judge


Dated:   January 23, 2014
              New York, New York